**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TINA MARIE SKAGGS,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **2:14-cv-00239-TFM** |
| | ) |
| **CAROLYN W. COLVIN**, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

April 22, 2015

### I.  Introduction

Tina Marie Skaggs ("Plaintiff") brought this action for judicial review of the decision of the Acting Commissioner of Social Security ("Acting Commissioner"), which denied her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403, 1381-1383(f). Now pending before the Court are the parties' Cross-Motions for Summary Judgment (ECF Nos. 7, 9). The Motions have been fully briefed (ECF Nos. 8, 10) and are ripe for disposition. For the reasons that follow, the Plaintiff's Motion will be **GRANTED**, and the Acting Commissioner's Motion will be **DENIED**.

### II.  Background

Plaintiff was born on July 16, 1965. (R. 37). She left high school in the 11th grade and does not have a GED. (R. 37). She can communicate in English, but she has difficulty reading, writing, and doing basic math. (R. 37-38). She is divorced and has two adult children, one from her ex-husband and one from a prior relationship. (R. 382). She has past relevant work experience as a short-order cook, housekeeper, sTock person, and fast-food worker. (R. 23).

1

However, she has not worked since 2009, when she left her job as a housekeeper. (R. 1607).

## A. Medical Evidence

Plaintiff underwent neck surgery twice in 2006. (R. 41, 1689, 1691, 1721). She also has a history of diabetes and hypertension, which predates her alleged onset date, as well as depression and anxiety. (R. 299). She has treated with her primary care physician, Peter Vaccaro, M.D., at V&S Medical Associates, on a regular basis for these and other conditions, for which she has been prescribed various medications.[1] (R. 287, 291).

She visited the ER in June 2008, complaining of neck pain. (R. 1689). CT scans showed anatomical alignment, no fracture/dislocation, and mild degenerative joint disease of the cervical spine. (R. 1691). Upon discharge, she was prescribed pain medications and a soft cervical collar and advised to see Dr. Vaccaro for pain management until she could see an orthopedic specialist. (R. 1690).

Thereafter, she continued treating with Dr. Vaccaro. (R. 276-286). In May 2009, Dr. Vaccaro noted that Plaintiff had stopped taking her diabetes and hypertension medications due to financial issues. (R. 283). As a result, her diabetes was uncontrolled, and her hypertension was malignant. (R. 283). The next month, Plaintiff complained of anxiety and depression to Dr. Vacarro. (R. 282). She reiterated these complaints throughout the rest of 2009 and early 2010, but her symptoms were largely stable. (R. 279-81). At an appointment on April 22, 2010, however, she reported experiencing increased depression and anxiety. (R. 278). She also said that her current prescriptions were not helping, so Dr. Vaccaro prescribed her Cymbalta, which she had taken before but apparently stopped taking sometime prior to this appointment. (R. 278).

On May 6, 2010, Plaintiff was hospitalized for suicidal ideation. (R. 873). During her

---

1. Dr. Vaccaro's handwritten notes are largely unintelligible, but the Court has done its best to decipher them.

initial evaluation, she reported that her suicidal thoughts were triggered by an argument with her 17-year-old daughter, with whom she has an up-and-down relationship, and other family members. (R. 866). Plaintiff told the attending doctor that she had been prescribed Cymbalta, which she described as "extremely beneficial" since it "resolved all the depression symptoms." (R. 876). Sometime before her hospitalization, however, she apparently ran out of Cymbalta, which was not covered by her health insurance, so her symptoms had gradually reemerged. (R. 876). Although she had been prescribed a new antidepressant, she felt it was not working. (R. 876). She explained that she had restarted taking Cymbalta a week prior to her hospitalization, though, and she could tell it was starting to work, as her symptoms were subsiding. (R. 876). Upon examination, Plaintiff displayed moderate distress. (R. 874). She also had a depressed mood/affect and appeared fearful. (R. 874). However, no abnormalities of thought content, thought form, or perception were noted, and her cognition was found to be adequate. (R. 877). Furthermore, she was assessed a global assessment of functioning ("GAF") score of 38. (R. 878). Plaintiff was discharged from the hospital the next day, at which time she "adamantly denie[d] any suicidal or homicidal ideation." (R. 895).

In September 2010, Plaintiff returned to Dr. Vaccaro's office with complaints of "very severe" depression and anxiety, which she considered "disabling." (R. 277). Dr. Vaccaro noted that Plaintiff was "unable to function" and was having "very severe" panic attacks. (R. 277). The next month, she again complained of anxiety, and she was continued on Cymbalta. (R. 276). She was also referred to the Guidance Center for counseling. (R. 276).

On October 20, 2010, Plaintiff underwent an intake evaluation at the Guidance Center. (R. 379). She reported feeling depressed and anxious, as well as having anger-management issues. (R. 279). She also reported having little energy and motivation and sleeping a lot. (R.

380). Significant stressors included problems with her ex-husband, financial troubles, and the death of her infant grandson. (R. 379). Plaintiff noted that she had previously experienced suicidal thoughts, but denied that she would actually do anything to harm herself because of her children and grandchildren. (R. 379). With regard to her medications, she reported that Cymbalta "helped her in the past" but no longer did so. (R. 379). She also reported that she was on probation "3 or 4 years ago" "for threatening to beat people up." (R. 380). After observing Plaintiff, the counselor remarked the she was coherent, cooperative, and responded appropriately to questions. (R. 380). Further, she did not display any loose associations and denied experiencing hallucinations or delusions. (R. 380). Based on her initial evaluation, the counselor diagnosed Plaintiff with depressive disorder, not otherwise specified, and generalized anxiety disorder. (R. 380). She also assessed Plaintiff with a GAF of 60 and recommended that Plaintiff undergo individual therapy on a weekly to monthly basis. (R. 380).

On November 3, 2010, Plaintiff underwent a psychiatric evaluation with Hardish K. Singh, M.D., at the Guidance Center. (R. 380). During the evaluation, she described having a long history of depression and said she had been hospitalized three times for depression and suicidal thoughts. (R. 381). Although she was taking Cymbalta, she felt the medication was not helping. (R. 381). She still felt very depressed and had "[s]leep problems, poor concentration, irritability, crying spells, feelings of hopelessness/helplessness, anhedonia, and fleeting suicidal ideation[,] [b]ut denie[d] any plans." (R. 381). She also described having panic attacks, which lasted between 15 to 30 minutes, and told Dr. Singh that she did not like to leave her house because crowded places caused her anxiety. (R. 381). At the same time, she reported that her hobbies were "walking, riding horses, and spending time with her grandchildren." (R. 382). A mental status exam was unremarkable. (R. 382). Dr. Singh diagnosed Plaintiff with major

depression, recurrent, and panic attacks with agoraphobia, and assessed a GAF of 60-65. (R. 382). He started her on Celexa, Abilify, and Klonopin, and decreased her dosage Cymbalta. (R. 715).

Plaintiff returned to Dr. Singh's office for a follow-up the next month, at which time she reported improvement in her condition but noted that she still felt depressed and anxious and suffered panic attacks. (R. 717). Dr. Singh's notes reflect that Plaintiff was cooperative, did not display any psychomotor agitation, denied suicidal/homicidal ideation, denied paranoia and/or hallucinations, was alert and oriented, displayed grossly intact cognition, and had fair insight and judgment. (R. 717). Her medications were adjusted and she was scheduled for a follow-up in four weeks. (R. 717).

At her next visit in early January 2011, Plaintiff reported that she had been doing better. (R. 718). Her anxiety had improved and she had not had a panic attack in two weeks. (R. 718). She did, however, report feeling tired after taking Klonopin. (R. 718). A mental status examination was again unremarkable, and Plaintiff was continued on her medications and also told to continue attending therapy. (R. 718).

At her next appointment with Dr. Singh in April 2011, Plaintiff said that she was still feeling very depressed and suffering panic attacks. (R. 719). She also reported hearing a mumbling voice in her head when she felt depressed. (R. 719). Dr. Singh, however, reported normal mental status findings. (R. 719). Plaintiff's medications were adjusted and she was advised to report back in a few weeks for a follow-up. (R. 719).

In May 2011, Plaintiff reported that she had been doing well since her medications were adjusted the month before. (R. 720). The mumbling voice had gone away, and Ativan was helping "a lot for her anxiety." (R. 720). As a result, she was continued on her medications at

current level and told to follow-up in two months. (R. 720).

On July 7, 2011, Plaintiff presented to the ER with suicidal ideation. (R. 1586). She was experiencing profound stressors, including her recent divorce and extreme financial constraints. (R. 1586). She also reported that she was experiencing increased stress because her elderly mother, her daughter, and her young grandchild had recently moved in with her. (R. 1586). The ER doctor, Roger Laroche, M.D., reported that Plaintiff did not display any abnormality of thought content or perception. (R. 1587). At the time, she denied suicidal ideation, though she stated that she felt suicidal earlier in the day and the day before. (R. 1587). Dr. Laroche noted that Plaintiff's "cognition [was] otherwise adequate including accurate answers to questions of general information." (R. 1587). Plaintiff was diagnosed with adjustment disorder with depressed mood and suicidal ideations and chronic major depression, in remission on a medication regimen, and she was assessed a GAF score of 40. (R. 1588). Plaintiff was discharged from the hospital on July 10, 2011, at which time she denied suicidal thoughts and displayed no abnormality of thought content, thought form, perception, or cognition. (R. 1589). Her GAF score upon discharge was 70. (R. 1590).

Following her hospitalization, Plaintiff was referred to the Guidance Center for additional counseling. (R. 542). During her intake evaluation on August 4, 2011, she reported feeling increased symptoms of anxiety and depression, accompanied by fatigue and nervousness. (R. 542). She was still having panic attacks caused by increased familial stress – particularly caring for her elderly mother. (R. 542). She also noted that she was having trouble sleeping, which caused her to feel fatigued on a daily basis, and, as a result, prevented her from being able to complete her "daily responsibilities." (R. 543). The therapist noted that Plaintiff was oriented to time, place and self; displayed mostly logical thought processes and no loosening of associations;

and her memory and attention span were deemed appropriate. (R. 543). "Overall," the therapist noted, Plaintiff "display[ed] a level of judgment and insight into her present situation deemed to be appropriate." (R. 543). Nevertheless, the therapist remarked that Plaintiff "appear[ed] to be of below average range intelligence." (R. 543).

Plaintiff continued to follow-up with Dr. Singh at the Guidance Center from September 2011 until June 2012. At various points throughout this time period, she reported improvements in both her depression and anxiety. (R. 539, 540, 541, 1756, 1755). Mental status exams were also unremarkable during this timeframe. (R. 539, 540, 541, 1756, 1755). By June 2012, Dr. Singh noted, "Overall, [Plaintiff] is doing well." (R. 1755).

Meanwhile, Plaintiff continued to complain of neck pain during her regular visits with Dr. Vacarro, and on October 6, 2011, Plaintiff went to the ER, complaining of a stiff neck. (R. 1530). Upon examination, she was diagnosed with a muscle strain and prescribed pain medications. (R. 1536). She was discharged the same day she was admitted. (R. 1536).

Plaintiff returned to the ER later that month and complained of pain in her right arm. (R. 1534). She was diagnosed with cervical stenosis with myelopathy. (R. 1532). An x-ray of her cervical spine showed spurring at C5, but no fracture or obvious foraminal encroachment was observed. (R. 1548). A CT scan of her cervical spine showed "stenosis at the C7-T1 level related to calcification of the posterior longitudinal ligament and posterior projecting ostephytic spurs." (R. 1546). Conversely, a CT scan of the right shoulder was unremarkable. (R. 1547).

In the ensuing months, Plaintiff saw Dr. Vaccaro on an almost-monthly basis for follow-ups. (R. 1760-62). All throughout this time, she continued to complain of neck pain, accompanied by a decreased range of motion. As a consequence, in June 2012, Dr. Vaccaro referredher to physical therapy, but she was discharged just a month later for non-compliance,

after missing six of her nine scheduled therapy appointments. (R. 1742).

### C. Opinion Evidence

In September 2010, Dr. Vaccaro filled out an Employability Assessment Form for the Pennsylvania Department of Welfare. (R. 1489). He checked the box for "permanently disabled," and noted that Plaintiff had been diagnosed with severe depression, severe anxiety, and severe panic attacks. (R. 1490).

Plaintiff underwent a psychological consultative examination with Bruce Simons, Ph.D., in March 2012. (R. 1605). Plaintiff complained of having severe panic attacks, with chest pain, sweating, and weakness in her legs. (R. 1608). She described having days when she could not leave her home and days "where she sleeps a lot and has no interest or energy in doing anything." (R. 1608). She also said that she has to avoid crowds. (R. 1608). Upon examination, Dr. Simons found that Plaintiff was a little anxious, but her eye contact was consistent and she was pleasant and cooperative. (R. 1608). Her affect and mood were stable and appropriate; no perceptual disturbances were noted; and thought processes were measured, goal-oriented, and coherent. (R. 1608). Dr. Simons found that her abstract reasoning was in the slightly above-average range; however, her intelligence was assessed to be in the borderline range. (R. 1608). Likewise, her general fund of knowledge was found to be far below average, and her concentration and attention span were measured. (R. 1608). In particular, she could not subtract serial sevens from 100 and so she became frustrated. (R. 1609). She also could not do simple multiplication problems. (R. 1609). Moreover, her immediate retention and recall were considered far below average, and her judgment was measured. (R. 1609).

Dr. Simons diagnosed Plaintiff with panic disorder with agoraphobia and assessed a current GAF of 55. (R. 1609). In addition, he opined that Plaintiff had slight limitations in

understanding, remembering, and carrying out short, simple instructions; understanding, remembering, and carrying out detailed instructions; and making work-related judgments due to her anxiety and low IQ. (R. 1610). Dr. Simons also opined that Plaintiff had moderate limitations interacting appropriately with the public, supervisors, and co-workers; responding appropriately to work pressures in a usual work setting; and responding appropriately to changes in a routine work setting. (R. 1610).

Plaintiff underwent a physical consultative examination in March 2012. (R. 1614-16). The examiner, Dilbagh Singh, M.D., noted that Plaintiff had full motor power in her arms and legs. (R. 1616). She was able to move all of her extremities well; straight leg raising was normal; and she could get in and out of the chair and bed normally and walk around the room on toes and heels normally. (R. 1616). Dr. Singh diagnosed Plaintiff with diabetes mellitus, which was under control with her medications; depression and anxiety, which was also under control; and obesity. (R. 1616).

On December 14, 2010, state agency psychologist Grant W. Croyle, Ph.D., reviewed Plaintiff's records and completed a mental RFC assessment form and psychiatric review technique form. (R. 250-66). According to Dr. Croyle, Plaintiff was not significantly limited in her ability to remember locations and work-like procedures; understand and remember very short and simple instructions; and understand and remember detailed instructions. (R. 250). Dr. Croyle further opined that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions; carry out detailed instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and  make simple work-related decisions; and was moderately limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain

regular attendance, and be punctual; and complete a normal workday and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 250-51). In addition, Dr. Croyle found that Plaintiff's ability to ask simple questions or request assistance, get along with coworkers or peers, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness was slightly limited, while her ability to interact appropriately with the general public and to accept instructions/respond appropriately to criticism from supervisors was moderately limited. (R. 251). Finally, Dr. Croyle opined that Plaintiff had slight limitations in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals, but moderate limitations in her ability to respond appropriately to changes in the work setting. (R. 251). In sum, therefore, Dr. Croyle concluded that Plaintiff could meet the basic mental demands of competitive work on a sustained basis despite her impairments. (R. 252).

In the psychiatric review technique form, Dr. Croyle considered whether Plaintiff met the requirements for Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). (R. 253). Assessing the Paragraph B criteria, Dr. Croyle opined that Plaintiff had moderate restrictions in activities of daily living; difficulties maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace. (R. 263). He further opined that she had not experienced repeated episodes of decompensation. (R. 263). Lastly, he concluded that the evidence failed to satisfy the Paragraph C criteria. (R. 264).

### B.    Procedural History

Plaintiff filed an application for SSI on July 12, 2010, and application for DIB on September 28, 2010, alleging disability as of February 15, 2008, due to severe depression,

anxiety, panic attacks, diabetes, and high blood pressure. (R. 175, 77, 232). Plaintiff's claims were denied at the administrative level. (R. 75-77). Thereafter, she filed a written request for a hearing, which was conducted, via video, on August 16, 2012, before Administrative Law Judge Margaret A. Donaghy ("ALJ"). (R. 32-75). Plaintiff was represented by counsel and testified during the hearing, as did an impartial vocational expert ("VE"). (R. 32-75).

On May 16, 2013, the ALJ issued an unfavorable decision to Plaintiff. (R. 25). The ALJ found that Plaintiff had the following severe impairments: major depressive disorder, anxiety disorder, cervical degenerative joint disease, obesity and diabetes. (R. 18). She concluded, however, that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the requirements of the Listings – though she only specifically addressed whether Plaintiff's depression met Listing 12.04 (Affective Disorders). (R. 19). At the next step in the sequential evaluation process, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work with some additional limitations:

> She can sit for up to 6 hours out of an eight-hour workday. She can stand or walk for up to 6 hours out of an eight-hour workday. She can occasionally perform kneeling, crawling, crouching, stooping, balancing and climbing stairs. She can understand, remember and carry out simple instructions and maintain attention and concentration for simple, routine work. She can perform low stress work meaning work requiring only occasional decision making and judgment, only occasional changes in work setting, procedures, and tools, and only occasional interaction with co-workers and the general public.

(R. 19). Although the ALJ found that Plaintiff could not return to her past relevant work, she could nevertheless perform several other jobs that exist in significant numbers in the national economy. (R. 23-24). The ALJ based this finding on the testimony of the VE, who identified the following jobs as ones a hypothetical claimant with Plaintiff's age, education, experience, and RFC could perform: small-parts assembler (SVP 2, light exertion, 248,090 jobs in the national economy), telemarketer (SVP 3, sedentary exertion, no numbers provided), advertising-material

distributor (SVP 2, light exertion), parking-lot attendant (SVP 2, light exertion, 124,500 jobs in the national economy), eyeglass-frame polisher (SVP 2, sedentary exertion, 7,880 jobs in the national economy), and charge-account clerk (SVP 2, sedentary exertion, 181,600 jobs in the national economy).[2] Thus, the ALJ found that Plaintiff is not disabled within the meaning of the Act.

The ALJ's decision became the final decision of the Acting Commissioner on August 13, 2014, when the Appeals Council denied Plaintiff's request for review. (R. 1-3). This appeal followed.

## III. Legal Analysis

### A. Sequential Evaluation Process

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1). When resolving the issue of whether a is disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment

---

2.      The VE had computer problems during the hearing that precluded her from identifying the number of jobs available in Plaintiff's region. (R. 62-71). Sometime after the hearing, however, the VE proffered the regional numbers for three of the jobs she identified with Pennsylvania apparently identified as the relevant region: advertising-material distributor (160 jobs in Pennsylvania), eye-frame polisher (1,180 jobs in Pennsylvania), and charge-account clerk (2,000 jobs in Pennsylvania). (R. 242). By a letter dated August 17, 2012, the ALJ forwarded this evidence to Plaintiff's counsel for her review, informing her that she could submit written comments concerning the evidence or request a supplemental hearing. (R. 243). Plaintiff's counsel responded via letter that Plaintiff had no objection to the admission of the exhibit proffered by the VE. (R. 1797). She argued, however, that the VE's testimony did not provide the ALJ with a sufficient basis to find that a significant number of jobs that Plaintiff is capable of performing exist in the national economy. (R. 1797).

that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

### B. Standard of Review

The Act strictly limits this Court's power to review the Commissioner's final decision. 42 U.S.C. §§ 405(g)/1383(c)(3). "This Court neither undertakes a de novo review of the decision, nor does it re-weigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002). Instead, this Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g). The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It consists of more than a scintilla of evidence but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

### C. Discussion

Plaintiff raises three separate arguments in support of her motion for summary judgment. For her part, the Acting Commissioner argues that the ALJ's decision is supported by substantial

evidence and, therefore, should be affirmed. Plaintiff's arguments will be addressed *seriatim*.

### 1.    Listing 12.04

Plaintiff first contends that the ALJ erred at Step 3 of the sequential evaluation by not finding her disabled under Listing 12.04.[3] At Step 3, the ALJ must determine whether the claimant's impairment meets or equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. "If the impairment is equivalent to a listed impairment then [the claimant] is per se disabled and no further analysis is necessary." *Burnett*, 220 F.3d at 119. "The burden is on the claimant to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment." *Id.* at 120 n.2 (citing *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992)). The ALJ, however, has the burden to identify the Listing(s) that correspond with the claimant's impairment(s). *Id.* After doing so, the ALJ must "fully develop the record and explain [her] findings at step 3," specifically addressing "whether and why [the claimant's] . . . impairments . . . are or are not equivalent in severity to one of the listed impairments." *Id.*

While *Burnett* requires an ALJ to explain her Step 3 determination, the Court of Appeals has since made clear that, in doing so, the ALJ is not required "to use particular language or adhere to a particular format in conducting [her] analysis." *Jones v. Barnhart*, 364 F.3d 501, 505

---

3.      Although the ALJ found that Plaintiff's degenerative joint disease, anxiety, and diabetes constituted severe impairments at Step 2, she did not identify any potentially applicable Listings and analyze whether either of these impairments met or medically equaled the requirements of any of the Listed Impairments. (R. 19). Instead, she only addressed Plaintiff's depression. (R. 19). Plaintiff has not argued, however, that the ALJ committed any error in this regard or that she satisfied the requirements of the Listings that might be applicable to these impairments, such as Listing 1.02, (Major Dysfunction of a Joint), 1.04 (Disorders of the Spine), 9.08 (Diabetes Mellitus), or 12.06 (Anxiety-Related Disorders). Accordingly, the Court will limit its discussion to whether substantial evidence supports the ALJ's finding that Plaintiff's depression does not meet the requirements of Listing 12.04. However, because the matter will be remanded for other reasons, the ALJ should also address whether any of the Plaintiff's additional severe impairments meet or equal the requirements of any of the Listings.

(3d Cir. 2004). The ALJ is just required "to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Id.* "Thus, if the ALJ's decision as a whole demonstrates substantial evidence to support the ALJ's conclusion, then the ALJ adequately satisfies the *Burnett* standard." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *6 (M.D. Pa. Mar. 14, 2014) (citing *Jones*, 364 F.3d at 504-505).

In this case, the ALJ identified Listing 12.04 as the relevant Listing and explained why, in her view, Plaintiff's depression did not meet its requirements. In assessing whether Plaintiff satisfied the Paragraph B criteria,[4] the ALJ first found that Plaintiff can "cook, clean, and do laundry, and has no problems with personal care." (R. 20). According to the ALJ, this meant that she only "has mild limitations with activities of daily living." (R. 20). The ALJ next found that although Plaintiff exhibits anxiety around crowds, she reported having a "good relationship with her mother and three brothers" and also that "she drinks socially." (R. 20). Accordingly, the ALJ assessed Plaintiff as having "moderate limitations with social functioning." (R. 20). Finally, the ALJ found that Plaintiff had only moderate difficulties maintaining concentration, persistence, or pace since, based upon her review of the record, "the only evidence of difficulty concentrating was at one consultative examination at which the examiner stated that [Plaintiff] had difficulty with serial sevens and spelling and became frustrated." (R. 20). Because the ALJ found that Plaintiff had not displayed any "marked" restrictions or difficulties in the Paragraph B criteria,

---

4. The required level of severity for [Listing 12.04] is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. Pt. 404, Subpt. P., App'x 1. A claimant can satisfy the Paragraph B criteria by showing at least two of the following: "(1) Marked restriction in activities of daily living; (2) Marked difficulties in maintaining social functioning; (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." *Id.* The Court notes that ALJ did not expressly address in her decision whether Plaintiff satisfied the Paragraph C criteria, but Plaintiff does not assign error to the ALJ's failure to do so. Nor has she attempted to argue that she satisfied the Paragraph C criteria. Thus, those criteria will not be considered.

she concluded that Plaintiff's depression did not satisfy Listing 12.04. (R. 20).

While Plaintiff does not take issue with the ALJ's finding that she is only mildly restricted in activities of daily living, she disagrees with the ALJ's finding that she does not have marked difficulties in social functioning and in maintaining concentration, persistence, or pace. The ALJ's "evaluation of the 'B' criteria," she argues, "is not supported by the notes of her own treating physicians or [her] reports on paperwork completed for the Administration or in her testimony." Pl.'s Br. at 13-14, ECF No. 8. In particular, she points to evidence that:

> [s]he shuts herself up at home and does not want to go anywhere. She has on and off explosive relationships with her mother and her daughter. She gets angry over things and will respond with outbursts. [She] is not a person who deals easily with stress in her life – as is clear from her several hospitalizations for suicidal ideation.

*Id.* at 14. She also contends that the ALJ "gave short shrift" to Dr. Simon's discussion of her trouble spelling and performing serial number progressions; her own testimony regarding her difficulty remembering, completing tasks, concentrating, understanding, and following instructions; and paperwork completed by her mother that "echoed a number of these issues, reiterating her difficulties with concentration and completion of tasks." *Id.*

The Court disagrees. Although the ALJ's Step 3 analysis consists of just one paragraph, "[t]he ALJ's decision, *read as a whole*, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [Plaintiff] did not meet the requirements for" Listing 12.04. *Jones*, 364 F.3d at 505 (emphasis added). In fact, in subsequent parts of her analysis, the ALJ discussed all of the evidence Plaintiff cites in support of her claim that the Paragraph B criteria were met and offered specific reasons why she was discounting such evidence. When discussing Plaintiff's RFC assessment, for example, the ALJ noted that her subjective complaints – including her testimony about spending upwards of 15 hours a day in bed – were not supported

by the objective evidence in the record. That evidence, as the ALJ explained, suggested that Plaintiff's symptoms of depression and anxiety were largely stable and, in fact, had shown steady improvement throughout 2011 and into 2012. The ALJ also discussed Plaintiff's two hospitalizations, but correctly observed that, on both occasions, her condition had improved by the time of her discharge. Furthermore, it is worth noting that none of the medical sources who examined Plaintiff or reviewed her file opined that she had marked limitations in social functioning or maintaining concentration, persistence, or pace. The state agency psychologist, Dr. Croyle, whose opinions were accorded great weight by the ALJ, found only moderate limitations in these areas. Likewise, the consultative examiner, Dr. Simons, upon whose report Plaintiff relies, felt that she was no more than moderately restricted. In sum, therefore, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff's depression did not meet the requirements of Listing 12.04.

Now, Plaintiff takes issue with the ALJ's reliance on Dr. Croyle's opinion, decrying it as "nothing more than a bare records review" upon which the ALJ could not rely. Pl.'s Br. at 12. Plaintiff's argument is misguided. As the Third Circuit Court of Appeals has explained, "[a]lthough treating and examining physician opinions often deserve more weight than the opinions of doctors who review records . . . [s]tate agent opinions merit *significant consideration* as well." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (emphasis added) (citing S.S.R. 96-6p (S.S.A. July 2, 1996)). Thus, contrary to Plaintiff's argument, the ALJ could not simply ignore Dr. Croyle's report. *Id.* Rather, she was entitled to consider it along with the other opinion evidence in the record and assign it considerable weight, as long as she sufficiently explained her reasons for doing so – which she did. Additionally, the Court "note[s] that the ALJ did not merely rubber stamp" Dr. Croyle's opinion. *Id.* (citing 20 C.F.R. § 404.1527(f)(1)(i)). On

the contrary, she veered from it in certain respects, adopting a slightly more restrictive view of Plaintiff's impairments than Dr. Croyle found.

Plaintiff also maintains that the ALJ improperly rejected Dr. Vaccaro's opinion that she was permanently disabled as of September 2010. Once more, Plaintiff's argument misses the mark. It is beyond question that "a statement by a plaintiff's treating physician supporting an assertion that [he] is 'disabled' or 'unable to work' is not dispositive . . . ." *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) (citing *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990)). In fact, the Social Security Administration has made clear that not only are these types of conclusory statements not "entitled to controlling weight," but they are not even entitled to any "special significance." Social Security Ruling ("S.S.R.") 96-5P at *5 (S.S.A. July 2, 1996). Therefore, the ALJ did not err in rejecting Dr. Vaccaro's barebones assessment of Plaintiff's ability to work, which was unsupported by his treatment records.

Lastly, Plaintiff challenges the ALJ's decision to accord little weight to Dr. Simons. This, too, is an unpersuasive argument. Even assuming that the ALJ did not provide a sufficient basis for rejecting Dr. Simons' opinion – and the Court does not find that she did – any such error would be harmless. *See Rutherford*, 399 F.3d at 556 (rejecting argument "because the claimed error did not affect the outcome of the analysis in any way"). For, although the ALJ stated that she was assigning little weight to Dr. Simons' opinion, her RFC assessment was entirely consistent with Dr. Simons' view that Plaintiff was no more than moderately limited in all areas of functioning. Therefore, even if the ALJ had said she was giving greater weight to Dr. Simons' opinion, as Plaintiff contends she should have done, she would not have concluded that Plaintiff met the requirements of Listing 12.04.

## 2. Physical Impairments

Plaintiff's second contention is that the ALJ failed to sufficiently discuss the evidence of her cervical degenerative joint disease and obesity. As a result, Plaintiff contends, the ALJ's conclusion that she "is limited to light work, but does not have disabling physical limitations" is not supported by substantial evidence. This, too, is an unpersuasive argument.

"The ALJ must consider all relevant evidence when determining an individual's residual functional capacity in step four." *Fargnoli*, 247 F.3d at 41 (citing 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546; *Burnett*, 220 F.3d at 121). This "includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Id.* (citing 20 C.F.R. § 404.1545(a)). The ALJ's RFC finding must, in turn, "'be accompanied by a clear and satisfactory explication of the basis on which it rests.'" *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). "'This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence.'" *Id.* (quoting *Cotter*, 642 F.2d at 705).

In this case, the ALJ gave sufficient consideration to the evidence related to Plaintiff's degenerative joint disease. (R. 21-22). To be sure, the ALJ's discussion of this condition was not lengthy, but neither was the objective medical evidence in support of it. Throughout the relevant time period, medical testing revealed benign findings, and Plaintiff received routine treatment. Moreover, when she was referred to physical therapy in the summer of 2012, she was discharged after just a month for non-compliance with her treatment plan. Notably, while Plaintiff contends that the ALJ ignored certain relevant evidence regarding her degenerative joint disease, she has not pointed to any evidence that might suggest she was more limited in her abilities than the ALJ

found her to be. Nor has the Court's independent review of the record revealed that any such evidence exists. It is also worth pointing out that none of Plaintiff's treating physicians, or the physical consultative examiner, associated any functional limitations with Plaintiff's degenerative joint disease. Finally, even if the ALJ did not discuss every last treatment note related to Plaintiff's cervical degenerative joint disease, "[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).

The Court also finds that the ALJ did not err in analyzing Plaintiff's obesity. Even though Plaintiff never raised the issue of her obesity, the ALJ considered its effects on her ability to work, as required by S.S.R. 02-1P at *1 (S.S.A. Sept. 12, 2002), but accurately noted that "there is no evidence of it causing any significant functional limitations." (R. 21). Once again, Plaintiff does not point to any specific evidence or weakness in the ALJ's analysis that would indicate functional limitations or aggravation of conditions that could warrant remand of the ALJ's decision. Merely speculating that her obesity intensifies various physical systems, without specifying how it actually impairs her ability to work, is not enough. *See Rutherford*, 399 F.3d at 553 (explaining that "when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding her [Plaintiff's] limitations and impairments," a generalized assertion that a plaintiff's obesity causes limitations on work is not enough to require reversal). Consequently, because Plaintiff has not specified how a further discussion of her obesity would have "affect[ed] the outcome of the case," a remand for additional consideration of her obesity is not mandated. *Id.*

### 3. Hypothetical Questions and VE's Testimony

Plaintiff next raises several objections related to the ALJ's finding that she retained the

RFC to perform jobs existing in significant numbers in the national economy. As previously noted, this finding was based on the testimony provided by the VE. Plaintiff argues, in essence, that the VE's testimony does not constitute substantial evidence because the ALJ's hypothetical questions did not fully reflect some of her physical and mental limitations. She also contends that, supposing that the ALJ's RFC assessment is accurate, she cannot actually perform several of the jobs identified by the VE in response to the ALJ's hypotheticals.

It is well established that the ALJ need not "submit to the vocational expert every impairment *alleged* by a claimant." *Id.* at 554 (emphasis in original). Rather, the ALJ's hypothetical "must 'accurately portray' the claimant's impairments . . ." *Id.* (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). "And that in turn means that the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*." *Id.* (emphasis in original). The Court of Appeals has offered guidance as to when a limitation is credibly established:

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response. Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence. Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible – the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason. Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it.

*Id.* (citations and quotation marks omitted).

With these principles in mind, the Court must consider the limitations that Plaintiff claims the ALJ improperly failed to incorporate into her RFC and, in turn, the hypotheticals she

posed to the VE. Plaintiff identifies several such limitations. To begin, she argues that the ALJ ignored her testimony about her problems using her left arm and hand and failed to recognize that she cannot sit for longer than 30 to 45 minutes at a time, which made her a candidate for a sit/stand option. She also argues that the ALJ failed to account for the effects that her borderline intelligence, depression, and anxiety would have on her ability to concentrate and follow directions and neglected to mention her inability to focus on tasks. Finally, she argues that the ALJ erred by failing to restrict her contact with supervisors. The Court concludes that the ALJ failed to give appropriate consideration to certain of these alleged limitations – namely, Plaintiff's difficulty using her left arm and hand and her inability to respond appropriately to supervisors – and, in turn, the ALJ may have posed incomplete hypotheticals to the VE. As a result, the ALJ was not entitled to rely upon the VE's responses as substantial evidence for her determination at Step 5.

First, the Court agrees that the ALJ's RFC and hypotheticals failed to account for numbness and tingling in Plaintiff's left arm and hand, which caused her to drop things. (R. 49). The ALJ never mentioned Plaintiff's testimony regarding this impairment, even though, if such testimony were found credible, it would certainly affect her ability to do two of the jobs the VE testified that she could perform: small-parts assembler and eyeglass-frame polisher, both of which require at least frequent reaching, handling, and fingering, according to the Dictionary of Occupational Titles ("DOT"). *See* DICOT 739.687-030 (explaining that small-parts assembler job requires constant reaching, handling, and fingering), 1991 WL 680180; DICOT 713.684-038 (explaining that eyeglass-frame polisher jobs requires frequent reaching, handling, and fingering), 1991 WL 679267. This case must, therefore, be remanded so that the ALJ may address Plaintiff's testimony regarding her numbness and tingling in her left arm and hand and

her inability to hold onto objects. If she finds Plaintiff's testimony on this impairment to be credible, she must then incorporate it into her RFC and hypothetical. *See Rutherford*, 399 F.3d at 554 (explaining that "limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible").

Next, Plaintiff argues that the ALJ failed to accommodate her inability to interact with supervisors, even though she did limit her interaction with co-workers and the general public. This was, indeed, an error. Dr. Croyle opined that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors,[5] and the ALJ purported to give Dr. Croyle's opinion great weight. As the Seventh Circuit Court of Appeals has observed, "even a moderate limitation on responding appropriately to supervisors may undermine seriously a claimant's ability to work." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir. 2010) (citations omiited). Despite that, the ALJ failed to explain why she did not incorporate Dr. Croyle's assessment of Plaintiff's difficulties in dealing with supervisors into her RFC and hypotheticals. In fact, she made no mention whatsoever of this portion of Dr. Croyle's report in her decision. Admittedly, the ALJ was not required to adopt each of the separate opinions in Croyle's report, even if she found it, on the whole, to be worth considerable weight. Rather, she could have adopted some and rejected others. *Cf.* S.S.R. 96–5p, 1996 WL 374183, at *4 (July 2, 1996) ("Adjudicators must remember, however, that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one."). Before doing so, however, she was required to explain why the specific opinion regarding Plaintiff's ability to work with supervisors was not

---

5.      Dr. Simons, whose opinion the ALJ said she was according little weight, also opined that Plaintiff was moderately limited in her ability to respond appropriately to supervisors. (R. 1610).

adopted. *See* S.S.R. 96–8p, 1996 WL 374184, at at *7 (July 2, 1996) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). Because the ALJ failed to do so, the Court cannot discern whether she rejected this opinion for "no reason or the wrong reason." *Plummer*, 186 F.3d at 429; *see also Lodwick v. Astrue*, No. 10–1394–SAC, 2011 WL 6253799, at *5 (D. Kan. Dec.13, 2011) (remanding case where ALJ asserted that he gave "substantial weight" to medical source's opinions, yet, without explanation, failed to include some of the limitations contained in the source's report in his RFC). Accordingly, on remand, the ALJ should address whether she credits Dr. Croyle's finding with regard to Plaintiff's ability to work with supervisors and if she decides to adopt that finding she should account for it in a new hypothetical.[6]

The Court need not address Plaintiff's remaining contentions because the ALJ's error in assessing Plaintiff's RFC and, in turn, posing potentially incomplete hypotheticals to the VE is

---

6.      The Court has considered Plaintiff's argument regarding her need for a sit/stand option, but finds this argument unsustainable. "When a claimant offers no medical evidence to suggest the need for a 'sit-stand' option, an ALJ may properly exclude a 'sit-stand' option from [her] RFC assessment." *Roche v. Astrue*, No. CIV.A. 11-3845, 2013 WL 1499511, at *4 (E.D. Pa. Apr. 12, 2013) (citing *Rutherford*, 399 F.3d at 555-56). As the ALJ found, although Plaintiff testified that she had trouble sitting, there was a dearth of medical evidence to support this claim. Thus, the ALJ properly did not include a sit/stand option in her RFC. Likewise, the Court has considered Plaintiff's argument regarding the ALJ's alleged failure to account for her borderline intelligence in her RFC. In reality, though, the ALJ did no such thing. Rather, the ALJ's RFC and hypotheticals adequately conveyed Plaintiff's intellectual limitations. In particular, Dr. Simons, upon whose report Plaintiff heavily relies, opined that Plaintiff's borderline intelligence and anxiety resulted in slight limitations in understanding, remembering, and carrying out short, simple instructions; understanding, remembering, and carrying out detailed instructions; and making work-related judgments; and moderate limitations interacting appropriately with the public, supervisors, and co-workers; responding appropriately to work pressures in a usual work setting; and responding appropriately to changes in a routine work setting. By limiting Plaintiff to "understand[ing], remember[ing] and carry[ing] out simple instructions and maintain[ing] attention and concentration for simple, routine work" and by limiting her to a low-stress environment, the ALJ's hypothetical adequately conveyed the limitations caused by Plaintiff's low IQ. These restrictions, likewise, properly accounted for the effects that Plaintiff's depression and anxiety would have on her ability to concentrate, follow directions, and focus on tasks.

sufficient to warrant a remand. Like Plaintiff, however, the Court is somewhat troubled by the ALJ's reliance on the VE's testimony. Therefore, the Court will highlight its concerns, such that they can also be addressed on remand, if need be.

First of all, there are several conflicts between the VE's testimony and the information in the DOT, each of which went unexplained. *See Boone v. Barnhart*, 353 F.3d 203, 208-09 (3d Cir. 2003) (explaining that an ALJ has an obligation to resolve conflicts between the VE's testimony and the DOT, and failure to do so may require remand). For example, the VE testified that Plaintiff could perform the job of telemarketer,[7] which the DOT explains has an SVP level of 3 and is thus considered semi-skilled work. *Id.* at 206-07 ("Occupations with an SVP of 3 or 4 are semi-skilled."). The ALJ, however, limited Plaintiff to understanding, remembering, and carrying out simple instructions and maintaining attention and concentration for simple and routine work – in other words, she was limited to unskilled work. *Douglas v. Astrue*, No. CIV.A. 09-1535, 2011 WL 482501, at *5 (E.D. Pa. Feb. 4, 2011) ("Unskilled work is consistent with simple, routine tasks."). So, in fact, a person with her RFC could not perform the job of telemarketer. Although the ALJ did ask the VE at the outset whether her testimony was consistent with the DOT, the ALJ never specifically inquired into this clear conflict, nor did Plaintiff offer any explanation in her decision as to why she believed Plaintiff could perform this job, despite being limited to unskilled work. Likewise, according to the DOT, the job of charge-account clerk requires "significant" contact with people and has a reasoning level of 3, a math level of 2, and a language level of 3. DICOT 205.367-014 (charge-account clerk), 1991 WL

---

7.      The VE never testified as to the number of telemarketer jobs available in either the regional or national economy, which is an additional basis for discounting the VE's testimony regarding this position. Also, whenever the VE identified this position at the hearing, the ALJ advised her that Plaintiff was limited to jobs with an SVP of 2, which suggests that, at least at the time of the hearing, the ALJ did not really believe that Plaintiff could really perform this job. However, the ALJ never explained why she ultimately found that Plaintiff *could* perform it.

671715. Because of Plaintiff's limited math and reading skills and because she can only have occasional contact with the general public, she does not appear to be able to perform the requirements of the charge-account clerk position as described in the DOT. Yet, again, the ALJ did not inquire into this conflict or ask the VE for further explanation as to how Plaintiff could still perform this job. Finally, the VE testified that Plaintiff could perform the job of parking-lot attendant, but this job, as described in the DOT, also requires "significant" contact with people and is therefore likely inappropriate for Plaintiff. *See* DICOT 915.473-010 (parking-lot attendant), 1991 WL 687865. This inconsistency also went unexplained.

The Court recognizes that there is not a conflict between the VE's testimony and the DOT with respect to the three other positions the VE identified: small-parts assembler, advertising-material distributor, and eyeglass-frame polisher. As already discussed, however, the ALJ did not address the effects of Plaintiff's alleged inability to use her left arm on her ability to work. Plaintiff's testimony regarding her difficulty using her arm and any medical evidence in support of it must be considered on remand and, if found credible, incorporated into Plaintiff's RFC assessment. Insofar as the ALJ finds that Plaintiff is, indeed, limited in the use of her left arm, she would unlikely be able to perform the small-parts assembler and eyeglass-frame polisher jobs, both of which require frequent or constant use of the hands.

If these two jobs are eliminated, only the job of advertising-material distributor would remain. The VE did not provide the number of jobs available in the national economy for this job, and she reported that there are only 160 such jobs available in the entire state of Pennsylvania. In the Court's view, that would not be enough to establish that there are a significant number of jobs in the national economy that Plaintiff could perform.

The Court is "further troubled . . . by the hesitation with which the VE identified the"

jobs for Plaintiff. *Boone*, 353 F.3d at 209. In response to the ALJ's hypothetical, the VE initially testified that there would be no jobs that Plaintiff could perform. (R. 62). When asked why, the VE started to explain, "[b]ecause most of the environments are – can be very stressful, even a simple –" (R. 62). But at that point, the ALJ interjected, "Well, I'm not talking stress; I'm talking – low stress work means is work requiring only occasional decision making and judgment; only occasional changes in the work setting, procedures, and tools; and only occasional interaction." (R. 62). The VE then changed course, stating, "All right; so there's a position as a small parts assembler . . ." (R. 62). At a later point in her colloquy with the ALJ, when attempting to identify additional jobs for Plaintiff, the VE testified, "it's unfortunately limited since I did not, with regards to her medical conditions, I didn't find a lot of occupations that would be appropriate." (R. 62). Again, the ALJ interjected: "I don't know what you mean by with regards to her medical condition. I'm only asking you based on a light work, lifting and carrying 20 pounds[.]" (R. 62). The VE then proceeded to identify the advertising-material distributor and parking-lot attendant jobs, before the ALJ changed her hypothetical, limiting Plaintiff to sedentary work. (R. 62). In response to the ALJ's new hypothetical, the VE identified the jobs of eyeglass-frame polisher and charge-account clerk.

The VE was never given the opportunity to explain the about-face in her testimony. Thus, it is not clear to the Court why she went from stating, in response to the ALJ's initial hypothetical, that there are no jobs that Plaintiff could perform to staying that such jobs do, in fact exist. This lack of explanation, coupled with the unexplained conflict between her testimony and the DOT and the fact that the ALJ failed to discuss the effects of Plaintiff's difficulty using her arm and hand and inability to respond appropriately to instructions and supervision, leaves the Court to conclude that "the VE's testimony does not by itself provide substantial evidence of

a significant number of jobs in the economy that [Plaintiff] can perform." *Boone*, 353 F.3d at 209.

IV.     **Conclusion**

It is apparent that the ALJ failed to provide sufficient support for her conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. However, the record is not sufficiently developed to demonstrate that Plaintiff is, in fact, disabled. Accordingly, this matter must be remanded for further consideration in accordance with this Memorandum Opinion.

In accordance with the foregoing, the Court will **GRANT** the Motion for Summary Judgment filed by Plaintiff and **DENY** the Motion for Summary judgment filed by the Acting Commissioner. An appropriate Order follows.

McVerry, S.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**TINA MARIE SKAGGS,**
        **Plaintiff,**

        **v.**

**CAROLYN W. COLVIN**,
ACTING COMMISSIONER OF
SOCIAL SECURITY,
        **Defendant.**

)
)
)
)
)
)
)
)
)

**2:14-cv-00239-TFM**

## <u>ORDER</u>

    **AND NOW**, this 22nd day of April, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that Plaintiff's MOTION FOR SUMMARY JUDGMENT (ECF No. 7) is **GRANTED IN PART**, the Acting Commissioner's MOTION FOR SUMMARY JUDGMENT (ECF No. 9) is **DENIED**, and the case is hereby **REMANDED** for further consideration.

                              BY THE COURT:

                              s/ Terrence F. McVerry
                              Senior United States District Judge

**cc:**    **Pamela M. Schiller, Esq.**
        Email: BSH@BSHLAW.NET

        **Christian A. Trabold, Esq.**
        Email: christian.a.trabold@usdoj.gov